# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **GRACIE MARIE JAMIAH,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION FILE NO.** |
| **v.** | : | **1:09-CV-01761-AJB** |
| | : | |
| **MICHAEL J. ASTRUE,** | : | |
| ***Commissioner of Social*** | : | |
| ***Security Administration,*** | : | |
| | : | |
| **Defendant.** | : | |

## ORDER[1] AND MEMORANDUM OPINION

Plaintiff, Gracie Marie Jamiah, ("Plaintiff"), brought this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying her application for disability insurance benefits.[2] For

---

[1]     The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73. [*See* Dkt. Entries dated 1/25/2010]. Therefore, this Order constitutes a final Order of the Court.

[2]     Title II of the Social Security Act provides for federal disability insurance benefits (hereinafter "DIB"). 42 U.S.C. § 401 *et seq.* Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.*, provides for supplemental security income benefits for the disabled (hereinafter "SSI"). Title XVI claims are not tied to the attainment of a particular period of insurance disability. *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982). The relevant law and regulations governing the determination of disability under a claim for DIB are identical to those governing the determination

the reasons stated below, the Court **REVERSES AND REMANDS** the Commissioner's final decision.

## I.   PROCEDURAL HISTORY

Plaintiff initially filed an application for DIB on April 12, 2006, alleging disability commencing on August 2, 1997. [Record (hereinafter "R") 102-07]. Plaintiff was insured for DIB through December 31, 2002. [*See* R7]. Plaintiff's application was denied initially and on reconsideration. [R64-65]. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). [R78]. An evidentiary hearing was held on July 10, 2008. [R22-63]. Following the hearing, the ALJ issued an unfavorable decision on July 25, 2008. [R4-15]. Plaintiff sought review of the ALJ's decision, and the Appeals Council denied Plaintiff's request for review on April 17, 2009, rendering the ALJ's decision the final decision of the Commissioner. [R1-3].

Plaintiff then filed a civil action in this Court on June 18, 2009, seeking review of the Commissioner's final decision. *Gracie Marie Jamiah v. Michael J. Astrue*, Civil

---

under a claim for SSI. *Davis v. Heckler*, 759 F. 2d 432, 435 n.1 (5th Cir. 1985). Under 42 U.S.C. § 1383(c)(3), the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI. In general the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI. Different statutes and regulations, however, apply to each type of claim. Plaintiff has only applied for DIB. Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claim.

AO 72A
(Rev.8/8
2)

Action File No. 1:09-CV-01761-AJB.  [Doc. 2].  The answer and transcript were filed on September 18, 2009.  [Docs. 8-9].  Plaintiff filed her brief on November 16, 2009, [Doc. 15], and the Commissioner filed a response on December 11, 2009, [Doc. 16]. Plaintiff also filed a reply brief.  [Doc. 24].  The undersigned held a hearing on February 24, 2010.  [*See* Doc. 26].  The matter is now before the Court upon the administrative record, oral argument, and the parties' pleadings and briefs and is ripe for review pursuant to 42 U.S.C. § 405(g).

## II.      STATEMENT OF FACTS

### A.      *July 10, 2008, Evidentiary Hearing*

At the time of the July 10, 2008, hearing, Plaintiff was 55 years old.  [R28].  She had a high school education and an associates degree.  [R53].  Plaintiff testified that in December 2001, her grandson and maybe her daughter were living with her.[3]  Plaintiff had adopted her grandson, and he had lived with Plaintiff since he was born.  Her grandson was 15 at the time of the hearing.  [R29].  Plaintiff had a driver's license back in 2002.  She had a home framing business in 1997 that lasted less than a year.  [R30]. Plaintiff also had a part time desk job in June 2001.  [R30-31].

─────────────────

[3]      According to notations from the medical record, it appears that Plaintiff's daughter moved out around June or July of 2002.  [*See* R886].

Plaintiff testified that prior to December 2002 she had daily anxiety attacks and would start crying without reason.  [R32].  Plaintiff would not get out of bed because of her depression and would stay in the house 24/7.  [R32-33].  Plaintiff reported that doctors had trouble controlling her blood pressure at this time, which led to dizziness and weakness.  [R33].  Plaintiff also believed that she had gout in her hands during this time.  [R33].  Plaintiff would get nervous whenever she was around more than two people because she was concerned that they were thinking about her.   [R33-34].  Plaintiff was easily distracted and could only concentrate on one thing at a time.  [R33].

Plaintiff testified that she had been in the military and was honorably discharged in 1984 or 1985.  The following exchange then occurred:

> ALJ:        Well now let me ask you, what's the relevance of this counsel?
>
> ATTY:     Well I was going to - - her disability rating, the first rating was before the date last insured, and the - -
>
> ALJ:        Yeah, but is that - - why is that relevant to my standards of disability?
>
> ATTY:     Although it's a different standard, I think the Social Security Rules and Regulations require that substantial consideration be given to a VA disability rating, so to the extent that it was before - - -

4

ALJ:        All right.  Can you - - if you know the answers to these questions, counsel, I'll take them for you.  Did she have a disability rating?

ATTY:        She had a disability rating that was 30 percent for the depression that was increased to 50 percent.  The 30 percent was before the [date last insured], and the 50 percent was as of the VA mental examination performed on December 20, 2004.

. . .

            And that . . . date is also the date they did the 100 percent, she was granted 100 percent unemployability rating as of that date too.

ALJ:        All right.  Go ahead.  Thank you.

[R37-38].

Plaintiff testified that she had sought mental heath treatment at the VA hospital in Atlanta and through other providers prior to December 2002.  [R38-39].  Plaintiff stated that she had a panic attack in June 1996 and another in 1997.  [R39-40].  According to Plaintiff, a Dr. Kelly recommended that Plaintiff reduce her hours to part time work and then suggested that she resign because she could not come to work on a regular basis.  [R40-41].  Plaintiff was not able to sleep well and would frequently wake up at night.  [R41-43].  Plaintiff indicated that Dr. Saldivia had treated her every two or three months since 1998.  [R44].  Plaintiff indicated that her condition in 2006 was worse than it was in 2002.  [R45].

5

Corrine Osby, a friend of Plaintiff's since 1998 or 1999, also testified at Plaintiff's administrative hearing. [R47]. Osby testified that she talked with Plaintiff regularly either in person or over the telephone. [R48]. Plaintiff had difficulty being around a lot of people and would make embarrassing comments. [R48]. Plaintiff had a poor short term memory. Osby indicated that these problems occurred around 2002 up until the hearing and that Plaintiff had gotten a little bit worse. [R49]. Osby also testified that Plaintiff had mood swings and would "trip[] out" at a teasing comment by Osby. [R50].

The Vocational Expert ("VE") testified that Plaintiff's past work was semiskilled. [R54]. The VE concluded that an individual with the following characteristics could perform work in the economy: (1) Plaintiff's age, education, and work history; (2) ability to perform light exertional work that involves simple, two-step instructions, routine and repetitious tasks and no strict production quotas; and (3) ability to only have occasional contact with the public, co-workers, and supervisors. [R54]. Specifically, the VE stated that this individual could perform unskilled, light work of bone picker, fruit cutter, or racker. None of these job involved interaction with the public. [R55]. These jobs did have a work flow and involved frequent handling.

6

[R57].  The VE testified that if the above individual was limited to occasional bilateral use of hands, the individual could still perform the racker job. [R57-58].

The VE next testified that an individual with the following characteristics could not perform competitive work: (1) Plaintiff's age, education, and work experience; and (2) frequent or occasional impairment in: (a) remembering work-like procedures; (b) maintaining attention for two-hour segments; (c) sustaining work without special supervision; (d) working close to others without being distracted; (e) having a normal work day or week; (f) performing at a consistent pace; (g) responding to changes in the work setting; (h) accepting instruction; (i) responding to criticism; and (j) dealing with normal work.  [R58-59, 60].  The VE explained that to perform competitive work, an individual must be able to consistently pay attention, deal with stress, follow instructions, and get along with others.  [R60-61].

B.    *Department of Veterans Affairs Disability Determination*

According to the May 3, 2007, decision by the Board of Veterans' Appeals, Plaintiff was rated 30% disabled for a depressive disorder in 1990.  [R366].  In 2007, the Board determined that Plaintiff met the 50% disability criteria for her depressive

7

disorder.  [R363, 370].[4]  This disability rating along with Plaintiff's disability ratings from endometriosis (30%) and left cyst removal (10%) meant that Plaintiff met the criteria for total disability on individual unemployability.[5]  [R364, 373-74].

C.    *Relevant Medical Records*[6]

A July 23, 1998, medical note indicates that Plaintiff was referred for evaluation because of a history of sexual trauma.  [R614, 1038, 1207].  Plaintiff stated that she was sexually abused by an older brother between the ages of 4 and 12, but that she did not want to examine her feelings until she began experiencing panic attacks in 1997. [R614-15, 1038-39].  The note indicated that Plaintiff quit her job at the post office because the job was causing emotional pain.  Plaintiff was described as talking slowly and deliberately and having difficulty discussing emotional issues.  Plaintiff represented

---

[4]      This alteration in the disability determination appears to be retroactive to March 2001 because this is the date that Plaintiff initially requested an increased rating for the depressive disorder.  [*See* R365, 366].

[5]      This total disability determination appears to be retroactive to July 2002, which is when Plaintiff submitted claims for total disability.  [R365].

[6]      The administrative record is two volumes and constitutes 1,683 pages. Given the length, the Court's summary of the medical record focuses on records relevant to the insured period (August 1997 through December 2002) and on the records that the parties assert are relevant to Plaintiff's disability claim.  Also, all of the records are treatment notes from the VA.

8

that she had not thought of suicide since 1991.  Plaintiff was described as having a slender build, being casually dressed with a neat appearance, having difficulty controlling her emotions, and having a memory grossly intact.  Plaintiff was assessed as follows: (1) rule out Post Traumatic Stress Disorder ("PTSD") on Axis I; (2) deferred on Axis 2; (3) severe history of trauma on Axis 4; and (4) a Global Assessment of Functioning Score ("GAF")[7] of 60 on Axis 5.  [R615, 1039, 1208].  The

_____

[7]      The undersigned has previously described the GAF score as "rat[ing] an individual's overall level of psychological, social, and occupational functioning." *Volley v. Astrue*, No. 1:07-cv-138-AJB, 2008 WL 822192, *2 n.6 (N.D. Ga. Mar. 24, 2008) (citing *Lozado v. Barnhart*, 331 F. Supp. 2d 325, 330 n.2 (E.D. Pa. 2004) (citing Diagnostic and Statistical Manual of Mental Disorders (4th Ed.) ("DSM-IV" at 32)). The GAF ranges

> from 0 to 100 and is divided into 10 ranges of functioning, requiring the examiner to pick a value that best reflects the individual's overall level of functioning using either symptom severity or functioning. . . . Each range can be described as follows: . . .; a GAF score of in the range of 41-50 indicates "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job);" a GAF score in the range of 51-60 indicates "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or coworkers);". . . .

*Id.* (quoting *Lozado*, 331 F. Supp. 2d at 330 n.2 (citing DSM-IV at 32, 34)).  Also, a GAF score between 61 and 70 indicates some mild symptoms like depressed mood and mild insomnia or some difficulty in social or occupational functioning, but generally the individual is functioning pretty well and has some meaningful interpersonal

9

plan was to have Plaintiff follow up at the mental health clinic for further evaluation, but not to prescribe medication because Plaintiff did not want to take it. [R615-16, 1039].

A medical note from October 22, 1998, indicated that lab tests revealed that Plaintiff was diabetic. The doctor believed that the diabetes could be controlled by diet and that Plaintiff should avoid sugar. [R1036].

Plaintiff began seeing a social worker, Martha McDonald, in November 1998.[8] The November 16 report from the visit indicated that Plaintiff believed that something was "terribly wrong feeling unhappy with profound emptiness." While still employed, Plaintiff saw a psychiatrist for six months following a severe panic attack and found the treatment helpful in reducing the attacks and in making her sleep better. [R1033]. Plaintiff worked for the Post Office from 1985 to 1997 as an administrative clerk. [1034]. At that time, Plaintiff's daughter and six year old grandson lived with her. [R1035].

_____

relationships. *See* DSM-IV at 34.

[8]     Plaintiff's treatment relationship continued with McDonald on a regular basis until January 2007 when McDonald left the "alpha team." [*See* R1214]. The undersigned has only summarized McDonald's notes for the period when Plaintiff was insured, *i.e.*, those notes between November 1998 and December 2002.

AO 72A
(Rev.8/8
2)

Plaintiff also began visiting a psychiatrist, Dr. Aida Saldivia, on December 2, 1998.[9]  Plaintiff reported having her first panic attach in 1993 during her mother's terminal illness and then having at least three severe panic attacks thereafter.  Plaintiff was sexually abused by an older brother when she was between 4 and 12 years old.  She also had previously tried to commit suicide on two occasions, once when she was 12 and the other time when she was 30.  Dr. Saldivia indicated that Plaintiff was alert and oriented, but her affect was "a bit labile" because she often cried when discussing her symptoms, had a depressed mood, and was angry.  [R1031].

Dr. Saldivia assessed Plaintiff with: (1) depressive disorder and symptoms of PTSD on Axis I; (2) endometriosis, diverticulosis, and hypertension on Axis II; (3) taking care of her grandson on Axis IV; and (4) a GAF of 58 on Axis V.  [R1032]. Plaintiff returned to see Dr. Saldivia on December 11 and reported feeling less depressed, less irritable, and better able to deal with stressors since starting the Zoloft. Plaintiff was alert, was oriented, had a less sad affect, was less depressed, was less anxious and irritable, and had good insight and judgment.  Dr. Saldivia observed that noticeable improvement had occurred with the Sertraline (an anti-depressant) prescription.  [R1029].

_____

[9]    Plaintiff was treated regularly by Dr. Saldivia until July 2006.  [R1281].

11

Plaintiff saw McDonald on December 14, who found Plaintiff oriented with a cautious mood and clear thoughts.  Plaintiff had fair judgment and insight.  [R1028]. Dr. Saldivia saw Plaintiff on December 28, 1998, and found that Plaintiff had depression with PTSD that was currently improving on a low dose of Zoloft.  [R1027]. Plaintiff returned to see McDonald on December 31, who found Plaintiff to be oriented with a bright mood and congruent affect.  Plaintiff had good insight and fair judgment. [R1025].

On January 22, 1999, Plaintiff was anxious with a sad mood and constricted affect.  Plaintiff's concentration was fair, and her judgment and insight were adequate. [R1024].

Dr. Saldivia saw Plaintiff on March 4, 1999, and assessed Plaintiff with depression and PTSD.  Plaintiff also reported having a panic attack in February, but she had good appetite, fair energy, and decent sleep.  [R1023].  McDonald noted that Plaintiff reported on March 17, 1999, with a bright and hopeful mood, decreased anxiety, panic-like symptoms, and depression.  At this meeting, Plaintiff was well groomed, with a bright smile.  She had a calm mood and full range in affect.  Her thoughts were clear and organized, and her concentration and memory were intact. [R1022].  On April 29, Plaintiff reported to McDonald that her depressive symptoms

12

AO 72A
(Rev.8/8
2)

and anger were improving, she enjoyed daily tasks, and had more patience for her grandson. Plaintiff was oriented and calm with a polite mood and normal affect. She had clear and organized thoughts with adequate judgment and insight. [R1021].

In May 1999, Plaintiff reported to Dr. Saldivia and McDonald that she was very happy with the results of her treatment. She was alert and had bright affect, euthymic mood, and organized associations. [R1018-19]. Dr. Saldivia provided the following diagnosis: "PTSD fro[m] sexual abuse, and sup[er]imposed depression, now improved with treatment." Plaintiff was to continue with Sertraline. [R1019].

Plaintiff reported to McDonald on June 16, 1999, as well dressed and groomed. Plaintiff was oriented with a bright mood and full range in affect. Plaintiff's thoughts were more clear and organized with fewer tangential thoughts. [R1017].

On August 12, 1999, Dr. Saldivia assessed Plaintiff with depression that was more symptomatic because of stress. Dr. Saldivia found Plaintiff's affect to be "a bit inappropriate, with tendency to smile while describing stressors." The doctor increased Plaintiff's Sertraline and encouraged her to keep appointments with the therapist. [R1015]. Four days later, McDonald noted that Plaintiff reported having minor setbacks. Plaintiff was oriented and pleasant and calm and had a bright affect and positive mood. [R1014]. On August 27, Plaintiff reported to McDonald that changes

13

in her medication had helped reduce the panic-like symptoms and sleep disturbance. McDonald found Plaintiff's insight to be adequate and her judgment limited, but that Plaintiff was oriented and cheerful with a bright mood.  [R1012].

On September 15, McDonald reported that Plaintiff was well dressed, but anxious with a guarded mood.  Plaintiff had clear and organized thoughts with an intact memory, adequate insight, and fair judgment. [R1011].  On September 27, Dr. Saldivia found that Plaintiff had depressive disorder that was effected by a crisis with her daughter.  Plaintiff was continued on Sertraline and given hydroxizine for anxiety. [R1010].  McDonald reported that Plaintiff was distraught and tearful on September 29. Her memory was intact while her insight and judgment were adequate and fair. [R1008].  On October 19, Plaintiff presented to McDonald as casually and neatly dressed but with a depressed and tearful mood, anxious behavior, and constricted affect. Plaintiff's memory and concentration were intact.  [R1007].

On November 20, 1999, Dr. Saldivia noted that Plaintiff reported to be much improved.  She was alert, oriented, cooperative with a pleasant affect and euthymic mood.  Plaintiff was diagnosed with stable depression and PTSD and was told to continue with Sertaline.  [R1005].

14

In Plaintiff's visits with McDonald in December 1999, Plaintiff was well-dressed with a pleasant mood and calm behavior. [R1003-04]. On February 9, 2000, McDonald reported that Plaintiff was casually and neatly dressed, had a positive and bright mood, calm behavior, and full range in affect. Plaintiff's memory and concentration were intact while her judgment was fair and insight was adequate. [R1002]. On March 6, 2000, Plaintiff reported to McDonald with an anxious mood, guarded behavior, and constricted affect. Plaintiff had adequate insight and limited judgment. [R1001].

Dr. Saldivia saw Plaintiff on March 20, 2000, and observed that Plaintiff was alert, oriented, "moodless depressed," and that she had a restricted affect, organized associations, and difficulty verbalizing. Plaintiff was diagnosed with PTSD and fairly stable depression. She was to continue with Sertraline and Vistaril for anxiety. [R1000].

McDonald reported on March 23 that Plaintiff had depressed mood, anxious behavior, and a constricted affect. Plaintiff's thoughts were clear and organized, and her memory and concentration were intact. [R999]. McDonald reported on April 5, 2000, that Plaintiff was going to take her father to New Orleans to visit a sick brother. Plaintiff was casually dressed, had a quiet mood, anxious behavior, and constricted

15

affect.  Plaintiff's memory and concentration were fair.  [R998].  On June 6, McDonald noted that Plaintiff was casually dressed with depressed mood, anxious behavior, and constricted affect.  Plaintiff's thoughts were clear and tangential.  She indicated having chronic sadness and disturbing negative thoughts about herself.  [R987].

On June 26, 2000, Dr. Saldivia found that Plaintiff had depression with some PTSD components, a mild increase in irritability, and an increase in problems with her boyfriend and daughter.  Plaintiff continued with Zoloft, but Dr. Saldivia started Plaintiff on Buspar for her severe anxiety.  [R983].

Plaintiff saw McDonald on July 13, 2000, and presented causally dressed with depressed mood, anxious behavior, and constricted affect.  Plaintiff's thoughts were clear and tangential while her memory and concentration were fair.  Also, Plaintiff's judgment was limited and her insight was adequate.  [R982].  Plaintiff presented to McDonald on July 28 with a bright mood, enthusiastic behavior, and full affect.  Her thoughts were clear and organized while her memory and concentration were intact. [R980].  McDonald made similar observations about Plaintiff on August 7 and August 14.  She also referred Plaintiff to weekly group therapy.  [R977-78].

16

Beginning around August 2000 and continuing past December 31, 2002,[10] Plaintiff attended a Women's Group run by McDonald.  Except where otherwise stated, Plaintiff participated in these group sessions, she had fairly clear and organized thoughts, she had fair memory and concentration, and she had good, fair, or adequate insight and judgment.  [R 862-64, 868-70, 877-78, 880, 888-89, 892, 894-95, 903-05, 908, 913 939-40, 943, 950-51, 964-66, 968, 970, 976].  For a period of time between May 4, 2001, and August 31, 2001, Plaintiff stopped attending the women's groups, but she started again on August 31.  [*See* R917, 937].

In September 2000, Dr. Saldivia found Plaintiff to be oriented with a pleasant affect, appropriate mood, organized associations, and good insight and judgment.  The doctor assessed Plaintiff with depression and PTSD symptoms that had improved with medication and therapy.  [R971].

---

[10]      Plaintiff continued to meet with the Women's Group for at least four years after the December 31, 2002, last insured date.  The progress notes between May 2006 and February 4, 2003, from the Women's Group generally reflect that Plaintiff was suffering from PTSD due to childhood sexual abuse while the earlier notes indicated that Plaintiff had dysthymia but was meeting treatment goals.  They were otherwise unremarkable concerning Plaintiff's mood, behavior, thoughts, memory, and concentration.  [R621-22, 639-40, 652, 655, 663, 672-74, 725-26, 732-38, 741, 744, 778-81, 815-16, 818-20, 831-34, 842, 848, 860, 863-64, 867-70].  One progress note from February 10, 2003, indicated, however, that although Plaintiff participated in group discussion, she had outbursts of inappropriate laughter.  Plaintiff had fair insight and limited judgment during this group meeting.  [R859].

17

On December 18, 2000, Plaintiff was described in a women's group note as a "[h]igh functioning female" who was well groomed and calm and appropriate during group. [R959].

Plaintiff presented to the VA with elevated blood pressure and symptoms such as headache and blurred vision on December 14, 2000. Plaintiff was referred to Dr. Miller and scheduled for an EKG. [R961-62]. On January 18, 2001, Plaintiff was assessed with unstable hypertension, and she was told to eat a low cholesterol diet, continue exercising, monitor blood pressure, and increase water intake. [R957].

Plaintiff reported to Dr. Saldivia on January 17, 2001, that she had lost $600 in Las Vegas. The doctor found Plaintiff alert, oriented, with full range affect, over inclusive associations, and fair insight. Plaintiff's diagnosis was PTSD and dysthymia with irritability. [R952].

A February 7, 2001, medical note indicated that Plaintiff had mildly elevated hypertension and normal renal function. Plaintiff was instructed to continue with exercise and a low salt diet. [R946].

During a February 16, 2001, group session Plaintiff had been threatened by group members. She was appropriately upset and withdrawn following the incident. [R944].

18

On May 17, 2001, Plaintiff reported to Dr. Saldivia that she was doing okay and that she had discontinued group therapy due to difficulties with another group member and her attempts to play doctor.  Plaintiff was alert and oriented with full range affect, euthymic mood, and organized associations.  Dr. Saldivia determined that Plaintiff was stable despite some relationship issues.  She was to continue with Sertraline and Buspar.  [R938].

Plaintiff reported to McDonald that she was having problems with her new part time job because she found dealing with the public stressful.  Plaintiff was well groomed with pleasant but anxious mood, cooperative behavior, and full affect.  Plaintiff had good eye contact, intact memory and concentration, and fair insight and judgment.  [R936].

A medical note from July 19, 2001, indicated that Plaintiff complained of a headache, a mild tremor in her hands, and feeling anxious.  [R929].  Plaintiff was assessed with anxiety, tremor, and hypertension, which resulted in her Lisinopril dosage being increased.  [R930].

McDonald observed that Plaintiff had a depressed mood, anxious behavior, and restricted affect on August 28, 2001.  Her memory and concentration were intact, but her insight and judgment were limited.  [R925].

19

An August 30, 2001, medical note indicated that Plaintiff was doing well.  Her panic attacks were easier to abort with Atenolol.  She was also assessed with hypertension.  [R919-20].

Dr. Saldivia described Plaintiff as being alert and oriented, but having a histrionic affect with frequent grimacing and limited eye contact.  Dr. Saldivia diagnosed Plaintiff with PTSD and increases in anxiety and irritability.  Plaintiff was advised to start taking Buspar again.  [R915].

Plaintiff returned to Dr. Saldivia on January 10, 2002, and indicated that she had stopped seeing McDonald but would restart to prevent an alcohol relapse.  Dr. Saldivia found Plaintiff oriented and alert with a full range affect, euthymic mood, and organized associations with difficulties expressing herself.  The doctor assessed Plaintiff with dysthymia and PTSD, but noted that Plaintiff was not currently depressed although she had increased anxiety.  [R912].

On January 25, 2002, McDonald observed that Plaintiff was casually dressed with calm mood and behavior and a bright affect.  Plaintiff had clear, but tangential, thoughts.  Her memory and concentration were intact while her insight and judgment were fair.  [R910].  McDonald made similar observations on February 12.  [R909].

20

Plaintiff saw McDonald on April 3, 2002. Plaintiff had a frustrated mood and a restricted affect, but she was cooperative. Plaintiff's memory and concentration were intact while her thoughts were clear and organized. [R906]. At the April 29, 2002, women's group, Plaintiff was fairly calm and participated in the group process, but she also engaged in inappropriate laughter. [R902]. On May 1, McDonald observed that Plaintiff had a sad mood, anxious behavior, and "labile affect." Plaintiff's memory and concentration were intact, but her insight and judgment were limited. [R901].

A medical note from May 9, 2002, indicated that Plaintiff was present for a follow up appointment for hypertension. She complained of fatigue and lack of endurance. [R896]. Plaintiff was assessed with hypertension and abnormal weight gain (30 pounds in the past year). [R897].

Dr. Saldivia saw Plaintiff on July 8, 2002, and found Plaintiff alert, oriented, and with a full range affect. Plaintiff stated that she was not depressed that her daughter moved out, but was hurt that her daughter did not often invite her over to her place. The doctor assessed Plaintiff with a GAF of 50 and stable depression but fluctuations in mood. Plaintiff was to continue with group therapy and her medications (Sertraline and Buspar). [R886].

21

A note from the July 17, 2002, women's group indicated that Plaintiff was anxious with inappropriate laughter. [R885]. A July 23, 2002, note from the women's group indicated that Plaintiff was calm and jovial with good insight and judgment. The note indicated that Plaintiff apologized to the group after becoming upset. [R884].

In an August 7, 2002, progress note, McDonald remarked that Plaintiff was feeling stressed about friendships. Plaintiff was dressed in colorful African attire with a disappointed mood. Her affect had a full range, but her thoughts were clear and organized. Plaintiff's memory and concentration were intact while her insight and judgment were fair. The social worker assessed Plaintiff with having depression and anxiety. [R883].

On September 23, 2002, Plaintiff was verbal, enthusiastic, and positive during the Therapeutic Ceramic Clinic. [R875].

Dr. Saldivia evaluated Plaintiff on October 16, 2002, and found that Plaintiff had stable depression, fluctuations in anxiety, and a GAF of 55. Plaintiff was alert, well dressed, and cooperative during the visit. She had no memory difficulties and good judgment and insight. Plaintiff was told to continue with Sertraline and Buspar for anxiety. [R872].

At the February 3, 2003, therapeutic ceramic group, Plaintiff was described as being "very verbal with peers," enjoying teasing and sarcasm to interact positively with peers, and having a bright, cheerful affect.  [R861].  On February 10, 2003, Plaintiff was observed interacting with other female veterans.  [R858].  She attended another ceramic clinic around February 26, 2003, and demonstrated no behavior issues and had a bright affect.  [R849].

Plaintiff met with Dr. Saldivia on May 7, 2003, and reported that she was doing well, had completed the process of becoming the adoptive mother of her grandson, and continued to isolate herself from friends.  Plaintiff was alert with good eye contact, had a euthymic mood, and slept okay with medication.  Dr. Saldivia evaluated Plaintiff with: dysthymic disorder under control, PTSD from childhood sexual abuse, and a GAF of 55.  [R843].

A medical note from November 26, 2003, indicated that Plaintiff was doing fair, was very sensitive to criticism, and was not sleeping well.  Plaintiff was alert, was oriented, and made good eye contact.  Dr. Saldivia assessed Plaintiff was PTSD, dysthymic disorder with mild depressive symptoms, and a GAF of 55.  Plaintiff was to continue on Sertraline.  [R817]

23

Plaintiff visited Dr. Saldivia on June 14, 2004, and reported doing "so-so" because she had developed pain and swelling in her right hand, which a doctor attributed to possibly being gout. As a result, Plaintiff had stopped her medications, but she had started to take Sertraline after being told that she did not have gout. Plaintiff was alert, oriented, and mildly despondent and anxious. Plaintiff was evaluated with a GAF of 55, PTSD from sexual abuse as a child, and dysthymic disorder with increased depressive and anxious symptoms due to inadequate medication. [R776, 1384].

Plaintiff saw Dr. Saldivia on October 4, 2005, and reported wanting to stop taking her medications but ultimately decided that she would not. Plaintiff was alert, oriented, anxious, and had impaired sleep. Plaintiff was given a GAF of 50 and assessed with stable dysthymic disorder and PTSD due to sexual abuse. Plaintiff was to continue with Sertraline and Buspar. [R664, 1315].

Plaintiff met with Dr. Saldivia on October 15, 2004, for an unscheduled visit concerning a letter of support for her unemployability. Dr. Saldivia noted that Plaintiff's dysthymia was currently rated 30%, but he believed that it should be increased due to her clinical symptoms, her level of functioning, and partial improvement despite treatment. Dr. Saldivia agreed to write a letter of support to

24

increase the dysthymia rating but not to provide a letter of unemployability.  [R739, 1358].

Dr. Saldivia then wrote a letter on October 22, 2004, noting that Plaintiff had been receiving treatment since December 1998 for chronic depression, panic episodes, and PTSD stemming from childhood sexual abuse.  Dr. Saldivia stated that Plaintiff:

> remains despondent and easily irritable when having to interact with people in any social context.
>
> In my clinical opinion, [Plaintiff] remains impaired from her dysthymic disorder on a social and work setting.

[R1656].

Plaintiff met with Dr. Saldivia on November 22, 2004, and was alert, euthymic, and sleeping better.  Plaintiff was assessed with PTSD, stable dysthymic disorder, and a GAF of 55.  Plaintiff was told to continue with Sertraline and Buspar.  [R731].

A December 9, 2004, consultative evaluation indicated that Plaintiff was alert, but had poor eye contact at the beginning of the evaluation.  Plaintiff was assessed as follows: (1) stable dysthymic disorder and PTSD on Axis I; (2) endometriosis and hypertension on Axis III; and (3) a GAF of 55.  [R728].

Dr. Saldivia evaluated Plaintiff on May 23, 2005, and noted that Plaintiff was in a 10-week research program for sexual abuse victims.  Plaintiff was alert, organized,

AO 72A
(Rev.8/8
2)

euthymic mood, but impaired sleep.  Dr. Saldivia assessed Plaintiff with a GAF of 55, stable dysthymic disorder, and PTSD from childhood sexual abuse.  Dr. Saldivia continued Plaintiff on Sertraline and Buspar, and he noted that he would not add a medication for sleep because Plaintiff could nap during the day.  [R689, 1331].

Plaintiff met with Dr. Saldivia on January 18, 2006, who assessed Plaintiff with stable dysthymic disorder and PTSD from childhood sexual abuse.  Plaintiff's GAF was 55.  She was told to continue with Sertraline and Buspar.  Dr. Saldivia noted that Plaintiff's great aunt was living with her and had become ill.  Plaintiff was observed having difficulty concentrating, but she was alert, oriented, and had stable sleep and energy.  [R643, 1301].

Dr. Saldivia's progress note from April 7, 2006, indicated that Plaintiff complained of being more depressed and irritable and not sleeping through the night.  Plaintiff reported having difficulty caring for an elderly aunt who had been staying with Plaintiff but who was moved because Plaintiff could not tolerate the situation.  Plaintiff was alert, tearful, and depressed.  She was assessed with dysthymic disorder, currently increased in symptoms because of family stressors and PTSD from childhood sexual abuse.  Plaintiff's GAF was 45.  Plaintiff was told to continue taking Sertraline, was

26

instructed to start taking Buspar, and was prescribed Trazodone (an anti-depressant). [R624].

Linda O'Neil, a non-examining psychologist, completed a Psychiatric Review Technique on June 19, 2006. [R1050-62]. O'Neil concluded that there was insufficient evidence to determine whether Plaintiff had a mental impairment. [R1050, 1062]. John Cooper, another non-examining psychologist, affirmed O'Neil's assessment on October 3, 2006. [R1069].

Dr. Saldivia saw Plaintiff on July 31, 2006, to discuss issues relating to terminating her treating relationship with the doctor so that she could see a female doctor. The doctor found Plaintiff alert and oriented with stable mood and affect and organized associations. [R1281]. Plaintiff was assessed as follows: (1) PTSD and dysthymic disorder on Axis I; (2) family issues on Axis IV; and (3) a GAF of 50. Plaintiff was told to take Trazodone every night and to continue with Sertraline and Buspar. [R1281].

Dr. Saldivia completed a Mental Impairment Questionnaire on September 20, 2006, indicating that Plaintiff suffered from PTSD and dysthymia on Axis I; had hypertension and hyperlipidemia on Axis III; and had a GAF of 50, which was her highest GAF of the past year. [R1677]. Dr. Saldivia determined that Plaintiff had sleep

AO 72A
(Rev.8/8
2)

disturbance, mood disturbance, social withdrawal, emotional liability, anhedonia, paranoia or inappropriate suspiciousness, feelings of guilt, difficulty thinking or concentrating, and intrusive recollections of a traumatic experience.  [R1677-78]. Dr. Saldivia determined that Plaintiff's difficulties arose because of paranoia and an inability to trust.  He stated that Plaintiff was not a malingerer.  [R1678].  Dr. Saldivia stated that Plaintiff's prognosis was unchanged in that she had not been able to sustain gainful employment due to poor concentration and inability to interact with others. [R1679].  Dr. Saldivia indicated that Plaintiff would miss work more than three times per month.  [R1680].

Dr. Saldivia determined that Plaintiff had fair ability (seriously limited, but not precluded) to: understand, remember, and carry out short instructions; maintain regular attendance and be punctual; make simple, work-related instruction; ask simple questions or seek assistance; get along with co-workers or peers; understand and remember detailed instructions; set realistic goals; and use public transportation. [R1680-81].  He determined that Plaintiff had good ability (limited but satisfactory) to: be aware of normal hazards; adhere to basic standards of neatness or cleanliness; and travel in unfamiliar places.  [R1681].  Finally, Dr. Saldivia found that Plaintiff had poor or no ability to: remember work-like procedures; maintain attention for two-hour

28

segments; sustain an ordinary routine without special supervision; work in coordination with or proximity to others; complete a normal workday or workweek; perform at a consistent pace; accept instructions and respond appropriately to criticism; respond to changes in the work setting; deal with normal work stress; carry out detailed instructions; deal with stress in semiskilled or skilled work; interact appropriately with the general public; and maintain socially appropriate behavior. [R1680-81]. In making these findings, Dr. Saldivia indicated that Plaintiff had poor concentration, persistent distrust, and an inability to tolerate other people. [R1681]. Finally, Dr. Saldivia found that Plaintiff had: slight limitations in daily living; marked difficulties in social functioning; frequent deficiencies of concentration, persistence or pace; and repeated episodes of deterioration or decompensation in work or work-like settings, causing the individual to withdraw. [R1682].

Dr. Kristine Hsu met with Plaintiff on January 10, 2007, for a followup for PTSD and depression. Plaintiff reported doing well overall on her psychological medications, but that she had limited socialization because of anxiety. Dr. Hsu found Plaintiff to be casually dressed with fair hygiene. Plaintiff shifted positions in her chair, but was cooperative with frequent, appropriate smiling. Also, Plaintiff became distracted easily. Dr. Hsu diagnosed Plaintiff as follows: (1) PTSD from sexual abuse and dysthymic

disorder on Axis I; (2) hyperlipidemia on Axis III; (3) family issues on Axis IV; and (4) a GAF of 50. [R1212]. Dr. Hsu made similar observations about Plaintiff on June 6, 2007, [R1649-50], and August 21, 2007, [R1632-34]. Dr. Hsu also referred Plaintiff to clinical psychologist, Monique Harris, at the August 2007 appointment. [R1634].[11]

Dr. Hsu completed a Mental Impairment Questionnaire on July 7, 2008, for Plaintiff's attorney. Dr. Hsu indicated that Plaintiff had: (1) PTSD and dysthymia on Axis I; (2) hyperlipidemia on Axis III; (3) family issues on Axis IV; and (4) a current GAF of 65, which was also the highest GAF score for the past year. [R1661]. Dr. Hsu determined that Plaintiff had: (1) mood disturbances; (2) social withdrawal or isolation; (3) intrusive recollections of a traumatic experience; (4) difficulty thinking or concentrating; (5) generalized anxiety; (6) dissociation; and (7) anxious/depressed mood with anxious affect. [R1661-62]. Dr. Hsu stated that Plaintiff was not a malingerer, was showing good response to therapy, was active with treatment, was utilizing coping techniques, and had kept her appointments. [R1662]. Dr. Hsu noted that Plaintiff's prognosis was "fair to good." [R1663].

Dr. Hsu believed that Plaintiff would be absent more than three times per month based on Plaintiff's impairments and treatment. [R1663-64]. Dr. Hsu stated that

---

[11]     Plaintiff saw Harris in September 2007. [R1631-32].

AO 72A
(Rev.8/8
2)

Plaintiff would have good ability (*i.e.*, limited but satisfactory ability) to understand and remember short and simple instructions, ask simple questions or request assistance, accept instruction and respond appropriately to criticism, and be aware of normal hazards. Dr. Hsu determined that Plaintiff would have a fair ability (seriously limited but not precluded) to: remember work-like procedures; carry out very short and simple instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; perform at a consistent pace; get along with coworkers or peers; respond appropriately to changes in a routine work setting; and deal with normal work stress. Also, Dr. Hsu determined that Plaintiff would have poor or no ability to: maintain attention for a two-hour segment; maintain regular attendance and be punctual; work in proximity to others without being distracted; and complete a normal workday or workweek without interruptions. [R1664]. Further, Dr. Hsu determined that because Plaintiff decompensated easily, had a labile mood and affect, and had significantly impaired concentration and attention, Plaintiff had poor ability to: understand, carry out, and remember detailed instructions; set realistic goals or make plans without others; and deal with stress of semiskilled or skilled work. Next, Dr. Hsu concluded that Plaintiff had unlimited ability to adhere to basic standards of cleanliness, had good ability to use public transportation, and had fair ability to interact with the

31

public, maintain socially appropriate behavior, and travel to unfamiliar places. [R1665]. Finally, Dr. Hsu stated that Plaintiff had: (1) slight limitations in daily living activities; (2) moderate limitations in social functioning; (3) frequent limitations in concentration, persistence, or pace; and (4) continual episodes of deterioration or decompensation in a work or work-like setting. [R1665-66].

### III.   ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Act on December 31, 2002.

2.    The claimant did not engage in substantial gainful activity (SGA) during the period from her alleged onset date of August 2, 1997, through her date last insured of December 31, 2002 (20 CFR 404.1520(b), 404.1571 *et seq.*).

. . .

3.    Through the date last insured, the claimant had the following severe impairments: depression and anxiety (20 CFR 404.1520(c)).

. . .

4.    Through the date last insured the claimant did not have an impairment or combination of impairments that met or medically equaled the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

. . .

AO 72A
(Rev.8/8
2)

5.    From the alleged disability onset date, August 2, 1997, through the date last insured, December 31, 2002, the claimant had the residual functional capacity to perform work at any exertional level that does not require: more than simple, routine, repetitive tasks, with one- or two-step instructions; or strict production quotas, defined as the requirement to produce a specified number of units of work in a specified period of time; or more than the occasional contact with coworkers or supervisors; or any contact with the public for the period of time.

. . .

6.    Through the date last insured, the claimant was unable to perform past relevant work (20 CFR 404.1565).

. . .

7.    The claimant was born on August 23, 1952, and was over 50 years old, which is defined as an individual closely approaching advanced age 50-54, on the date last insured (20 CFR 404.1563).

8.    The claimant has at least a high-school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the medical-vocations rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41; 20 CFR Part 404, Subpart P, Appendix 2).

10.   Through the date[] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that [t]he claimant could have performed (20 CFR 404.1560(c), 404.1566).

33

. . .

> 11.   The claimant was not under a disability as defined in the Act, at any time from August 2, 1997, the alleged onset date, through December 31, 2002, the date last insured (20 CFR 404.1520(g)).

[R11-13].

The ALJ explained that Plaintiff had severe impairments of depression and anxiety, but that these impairments did not reduce her exertional capacity.  The ALJ noted that Plaintiff had treatment and/or diagnoses for back pain, hypertension, and diabetes, but that the medical records did not indicate that there were functional limitations with these impairments.  As for Plaintiff's submitted list of impairments, the ALJ concluded that the substance abuse and other mental diagnoses were either not severe or were encompassed in the depression and anxiety findings.  [R9].

The ALJ determined that Plaintiff's impairments did not meet or equal Listings 12.04 or 12.06 because she did not have marked limitations in two of four categories listed in Part B.  First, the ALJ stated that Plaintiff had only mild restrictions in daily living activities in that Plaintiff exercised, took trips, took classes, and cared for children.  Second, the ALJ determined that Plaintiff had moderate difficulty in social functioning based on Plaintiff's inappropriate laughter and anxious behavior in therapy sessions and Plaintiff's stated discomfort dealing with the public.  Third, the

34

ALJ found that Plaintiff had moderate difficulty maintaining concentration, persistence, or pace due to her depression, but that she still could do low-stress tasks.  Finally, the ALJ found that Plaintiff did not have repeated episodes of decompensation.  [R10]. The ALJ also determined that Plaintiff did not satisfy the criteria of part C for Listings 12.04 and 12.06 because there was no evidence of repeated instances of decompensation and there was no evidence of a complete inability to function outside of the home.  [R11].

The ALJ next determined that Plaintiff could perform the following tasks at any exertional level: simple, routine tasks; work with relaxed production quotas; and work with no contact with the public and occasional contact with coworkers or supervisors. The ALJ noted that Plaintiff's complaints of persistent panic attacks and crying spells and prolonged isolation were undocumented.  [R11].  As for Plaintiff's complaints of poor memory and interacting with the public, the ALJ noted that Plaintiff was able to take extended trips and care for family.  [R11-12].  The ALJ stated he was not giving treatment records outside of the insured period weight because they did not relate back to this period.  As for Dr. Saldivia's 2006 evaluation, the ALJ found that it was not consistent with the medical records for the relevant period while the 2004 evaluation was consistent with the RFC.  The ALJ stated that he did not give Dr. Hsu's opinion

35

significant weight because it did not reflect the insured period.  As for Plaintiff's complaints stemming from hypertension and gout, the ALJ noted that the treatment records did not reflect the problems reported by Plaintiff and that Plaintiff's subjective complaints four years after the fact were not credible.  [R12].  The ALJ determined that the testimony by Plaintiff's friend insofar as it related to pre-December 2002 was consistent with the RFC.  [R12-13].

The ALJ explained that the VE testimony established that Plaintiff could do work in the national economy despite her nonexterional limitations.  [R13-14].  The ALJ rejected the questioning by Plaintiff's attorney concerning the ability to handle items because there was no evidence of problems with handling.  He also rejected the attorney's suggestion that Plaintiff could not attend or concentrate because the treatment records did not support this as Plaintiff regularly received a GAF in the 50s. [R14].

In making the above findings, the ALJ did not refer to the disability findings of the VA.  [*See* R7-15].

## IV.    STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if she is unable to "engage in any substantial gainful activity by reason of any medically

36

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.   42 U.S.C. §§ 423(d)(2)-(3).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner.  The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits.  *See* 20 C.F.R. § 404.1512(a).  The Commissioner uses a five-step sequential process to determine whether the claimant has met his burden of proving disability.  *See* 20 C.F.R. § 404.1520(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  The claimant must prove at step one that he is not undertaking substantial gainful activity.  *See* 20 C.F.R. § 404.1520(b).  At step two, the claimant must prove that he is suffering from a severe impairment or

37

combination of impairments which significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. § 404.1520(c). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education and work experience. *See* 20 C.F.R. § 404.1520(d). At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that the impairment prevents performance of past relevant work. *See* 20 C.F.R. § 404.1520(e). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. § 404.1520(f). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Doughty*, 245 F.3d at 1278 n.2.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. § 404.1520(a). Despite the shifting of burdens at step five, the overall burden rests upon the claimant

38

to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).

## V.    SCOPE OF JUDICIAL REVIEW

The scope of judicial review of a denial of Social Security benefits by the Commissioner is limited. Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. The findings of the Commissioner are conclusive if they are supported by substantial evidence and the Commissioner applies the correct legal standards. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). "Substantial evidence" means more than a scintilla, but less than a preponderance. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be

39

enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VI.    CLAIMS OF ERROR

Plaintiff claims that the Commissioner's final decision should be remanded because of the following three errors: (1) the ALJ failed to consider the disability finding by the Board of Veterans' Appeals ("VA disability determination"); (2) the ALJ did not comply with Social Security Ruling 83-20 to determine the onset date of Plaintiff's disability; and (3) the ALJ's RFC determination was not supported by substantial evidence. [*See* Doc. 15].[12] Because the Court concludes that the ALJ erred

---

[12]    The Commissioner's brief suggests that Plaintiff raised a fourth claim of error because the brief responds to a suggestion in the facts section of Plaintiff's brief indicating that Plaintiff might meet Listing 12.04. [*See* Doc. 16 at 19-20]. The Court does not address this issue because: (1) it was not listed as an issue in Plaintiff's brief; and (2) Plaintiff did not raise it at oral arguments. [*See* Doc. 11 at 2, 3 (requiring a statement of issues for review presented in separate numbered paragraphs and stating: "The issues before the Court are limited to the issues *properly* raised in the briefs. Any

40

in ignoring the VA disability determinations, the Court discusses this issue in detail and only briefly addresses the other two issues.

A.      *Veterans Administration Disability Determinations*

Plaintiff argues that the ALJ erred by failing to discuss, consider, or mention the disability determinations by the Veterans Administration because this disability finding must be given great weight by the ALJ.  [Doc. 15 at 14-16].  Plaintiff asserts that the VA disability determinations are highly relevant because: (1) the VA and Social Security definitions of disability are similar; (2) the VA continued to increase Plaintiff's disability rating between 1990 and 1997; and (3) the VA determinations were well informed in that they were made closer to Plaintiff's insured period and based on Plaintiff's complete medical records with the VA.  [*Id.* at 16-17].

The Commissioner responds by first noting that the disability standard for VA disability claims is not similar to the Social Security disability standard because the VA's standard is less strict.  [Doc. 16 at 5 (citing *Pearson v. Astrue*, 271 Fed. Appx. 979 (11th Cir. 2008)].   The Commissioner next argues that the ALJ implicitly considered and rejected the VA disability determination because the ALJ relied on the

_____

issue raised in the briefs but not argued at oral hearing, if one is held, will be deemed abandoned.")].

41

same evidence as the VA and discussed the VA finding at the hearing.  [*Id.* at 5-7 (relying on *Kemp v. Astrue*, 308 Fed. Appx. 423 (11ᵗʰ Cir. Jan. 26, 2009))].   The Commissioner also contends that the VA decision from May 2007 was not relevant to Plaintiff's disability application because it was made four years after Plaintiff's last insured date and was based on evidence following the last insured date.  [*Id.* at 8].

Plaintiff responds that the case should be remanded because the ALJ's lack of consideration for the VA decision demonstrates that he did not give it great weight. [Doc. 24 at 2].   Plaintiff also argues that the Plaintiff's 100% unemployability rating was retroactive to July 2002, which was during the period when Plaintiff was insured. [*Id.* at 3].  Plaintiff contends that the Commissioner is not correct in arguing that the VA determination was based on records after 2002 because the VA considered records from 1998.   [*Id.* at 3-4].   Plaintiff asserts that the ALJ's reference to the VA determination at the hearing did not demonstrate that he gave it great weight because he demonstrated indifference to the VA.  [*Id.* at 5].  Plaintiff argues that the ALJ's citation to treatment records is not equivalent to giving great weight to the VA disability determination, so the Court should reject the Commissioner's position that consideration of such records renders any error harmless.  [*Id.* at 6].

42

A VA rating is not binding on the Commissioner.  *See* 20 C.F.R. § 404.1504 ("A decision by . . . any [ ] governmental agency about whether you are disabled . . . is not binding on [the Commissioner].").  Although not binding, the Eleventh Circuit requires that the VA determination "be considered and [ ] entitled to great weight." *Rodriguez v. Schweiker*, 640 F.2d 682, 686 (5th Cir. Mar. 25, 1981)[13] (citing *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980) and *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)).  Additionally, "[t]he ALJ must state specifically the weight accorded each item of evidence and the reasons for his decision." *Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir. 1986).  At the same time, an ALJ decision will not be in error if the context of the decision indicates that the ALJ implicitly made a finding about the VA disability rating.  *See Kemp v. Astrue*, 308 Fed. Appx. 423, 426 (11th Cir. 2009) (concluding that ALJ's reference to VA rating and reliance on VA records indicated that he implicitly determined that the VA ratings were entitled to great weight) (citing *Hutchison v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986)).

Further, the ALJ is not required to refer to every piece of evidence in the record. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005); *Hutchison*, 787 F.2d at 1463

---

[13]      In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

(stating that the ALJ need not "mechanically recite the evidence leading to her determination"). However, a court cannot affirm the Commissioner's final decision if "it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Luckey v. Astrue*, 331 Fed. Appx. 634, 639 (11th Cir. 2009) (quoting *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)); *Dyer*, 395 F.3d at 1211 (quoting *Foote*, 67 F.3d at 1561) ("[T]he ALJ's decision [cannot be] . . . a broad rejection which is 'not enough to enable [the reviewing courts] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole.' "). Similarly, a court "may not supply a reasoned basis for [an] agency's action that the agency itself has not given." *Dixon v. Astrue*, 312 Fed. Appx 226, 229 (11th Cir. 2009) (quoting *Zahnd v. Sec'y Dep't of Agr.*, 479 F.3d 767, 773 (11th Cir. 2007)).

The Court concludes that the ALJ erred by failing to consider the VA disability determinations. As the case law above demonstrates, the ALJ should have considered the VA disability determinations and given these determinations great weight (or presumably explained why they were not entitled to great weight). Although the ALJ's decision is otherwise well reasoned, the ALJ's opinion does not mention or acknowledge the VA disability findings, and it does not otherwise explain the weight

44

given to these determinations.  This was error.  *See Speagle v. Astrue*, No. 3:08-cv-1046, 2010 WL 750341, *5 (M.D. Fla. Mar. 4, 2010) (remanding where "the ALJ made no reference to the VA's disability rating [because] it [was] impossible to determine whether the ALJ simply overlooked the VA's disability rating, or whether the VA's disability rating was given the appropriate weight"); *Smith v. Astrue*, No. 3:08-cv-406, 2009 WL 3157639, *7 (M.D. Fla. Sept. 25, 2009) (finding that ALJ's conclusory reference to VA disability determination without discussion of weight given warranted remand for the ALJ to apply the correct legal standard); SSR 06-03p (noting that the ALJ "should explain the consideration given to [other governmental agency] decisions"); *cf. Higgins v. Astrue*, No. 1:07-cv-1073, 2009 WL 499465, *4 (M.D. Ala. Feb. 27, 2009) (finding no error where ALJ's decision mentioned VA decision several times, the ALJ stated he gave full consideration of the decision, and the ALJ stated that the VA decision was not binding given the different standards and rules).

As for the Commissioner's arguments to the contrary, the Court rejects them for the reasons that follow.  First, the Commissioner's argument that the VA disability standard is less stringent that the Social Security disability standard is unpersuasive in this case.  This rationale may be a valid basis for rejecting the VA disability determination.  *See Pearson v. Astrue*, 271 Fed. Appx. 979, 981 (11th Cir. 2008) ("The

45

record establishes that the [ALJ] considered the rating in his decision and correctly explained that a claimant had to satisfy a more stringent standard to be found disabled under the [Act].”); SSR 06-03p (“[B]ecause other agencies may apply different rules and standards than [the Commissioner does] for determining whether an individual is disabled, this may limit the relevance of a determination of disability made by another agency.”).  *But see Hogard v. Sullivan*, 733 F. Supp. 1465, 1468 (M.D. Fla. 1990) (finding it an insufficient justification for not according great weight to a disability determination where ALJ’s only basis for rejecting the VA rating “was that the two agencies used different criteria to evaluate disability claims”).  However, the ALJ never discussed the VA rating, so the Court cannot determine whether the ALJ rejected the VA disability rating because of it being based on different standards.  To find otherwise would be to allow the Commissioner to make a post hoc justification for the ALJ’s decision, which is not permitted.  *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962) (“The courts may not accept appellate counsel’s post hoc rationalizations for agency action; [*SEC v.*] *Chenery* [*Corp.*, 318 U.S. 63, 87-88 (1943),] requires that an agency’s discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself . . . .”); *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984) (declining “to affirm simply because some rationale might

46

have supported the ALJ's conclusion [because s]uch an approach would not advance the ends of reasoned decision making").

Second, that the VA disability determinations were made in 2007 is not a basis to reject them. As Plaintiff notes, the disability rating decision for Plaintiff's depression stems from her March 2001 claim seeking an increase in her depression disability rating and from her July 2002 claim seeking total disability. [*See* R365 (noting that Plaintiff "submitted her claims for increased evaluations in March 2001" and "submitted her claims for [total disability evaluation based on individual unemployability] in July 2002")]. The VA disability legal regime indicates that Plaintiff was entitled to an award from the period when she filed her claims for disability. *See* 38 C.F.R. § 3.151(b) ("Where disability pension entitlement is established . . ., the pension award may not be effective *prior to* the date of receipt of the pension claim . . . ."); 38 C.F.R. § 3.400 (stating that "the effective date of an evaluation and award of pension . . . based on an original claim . . . will be the date of receipt of the claim or the date entitlement arose, whichever is later"); *see also* 38 U.S.C. § 5110(a) ("[T]he effective date of an award based on an original claim . . . or a claim for increase . . . shall not be earlier than the date of receipt of application

47

therefor.").[14]  Thus, the 2007 VA disability determination appears to relate back to the

period when Plaintiff filed her claims in March 2001 and July 2002.  In other words,

the 2007 ratings increase to 50% for Plaintiff's depression is relevant for the period

after March 2001 when Plaintiff sought to increase her depression disability rating, and

the 2007 total disability determination is relevant for the period after July 2002 when

Plaintiff filed her total disability claim.   Thus, the Court concludes that the 2007 VA

disability decision is relevant for a portion of the period when Plaintiff was insured.

As such, that the VA ultimately ruled in Plaintiff's favor in 2007 does not excuse the

ALJ for ignoring the VA decision because it appears to have related back to Plaintiff's

original VA disability claims from March 2001 and July 2002.[15]

---

[14]       Although the law relating to VA disability claims indicates that a disability
determination can be fixed after the date a claim is filed, there is no indication that the
VA determined that the rating increase to 50% for Plaintiff's depression and the total
disability determination arose at a time after Plaintiff filed her claims.

[15]       Additionally, the ALJ's decision does not discuss the VA's 30% disability
rating for Plaintiff's depression, which was Plaintiff's rating at the time she filed her
March 2001 claim.  [R366].  This rating continued into Plaintiff's insured period, but
the ALJ never examined this rating.  The Commissioner's brief has not accounted for
this failure, and the Eleventh Circuit case law requires that the rating be considered.
The Commissioner raised an interesting argument at oral argument, namely that
although it may have been error to ignore this 30% rating, this error was harmless
because Plaintiff was capable of working between 1991 and 1997 despite having the
30% disability rating, thereby undermining any argument that such a rating required a
disability finding.  If the ALJ's failure to consider the 30% rating had been the ALJ's

48

Finally, the Commissioner's reliance on the Eleventh Circuit's *Kemp* decision, is not persuasive because *Kemp* is clearly distinguishable. The ALJ in *Kemp* "continuously" referred to the "VA's evaluations and disability rating throughout the evaluation process," and the ALJ explained why a 30% disability rating for PTSD did not qualify as a severe impairment for Social Security purposes. *Kemp*, 308 Fed. Appx. at 427. Here, the ALJ's decision omitted any reference to the VA determinations, so the extensive consideration of the VA disability determinations in *Kemp* is not present in this case. Thus, the Court concludes that the ALJ did not implicitly consider or give the VA disability determinations great weight.[16]

---

only error relating to the VA disability findings, the Court may have agreed with this argument. However, given the complete absence of consideration of the 50% disability rating after March 2001 and the total disability determination after July 2002, the Court finds that it is better for the Commissioner to consider all VA disability determinations on remand.

[16]   That the ALJ and Plaintiff's attorney mentioned the VA disability decisions at the evidentiary hearing does not alter the Court's conclusion. At the hearing, Plaintiff's counsel merely summarized the VA findings. The ALJ made no attempt to explain why he rejected the VA findings at the hearing. If anything, the ALJ questioned the relevance of the VA disability decision. [*See* R37]. The exchange at the hearing therefore does not persuade the Court that the ALJ gave due consideration to the VA disability ratings. Given this lack of discussion, the Court concludes that the ALJ erred in failing to consider the VA disability determination.

AO 72A
(Rev.8/8
2)

Although the circumstances of *Kemp* are distinguishable, the Court is aware that the Commissioner's argument - - the ALJ's analysis of and reliance on the VA treatment records show that the ALJ implicitly gave the ratings great weight, [*see* Doc. 16 at 6] - - is supported by at least one district court in the Eleventh Circuit.  In *Wiley v. Astrue*, the district court noted that the ALJ's decision "did not specifically mention, or state the weight given, to the VA disability rating."  *Wiley*, No. 07-cv-663, 2009 WL 734134, *1 (S.D. Ala. Mar. 16, 2009).  Despite this omission, the *Wiley* Court determined that the ALJ implicitly considered the VA disability rating because the ALJ in making the disability determination examined, discussed, and relied on "the evidence underlying the VA rating" and agreed with the VA doctor who determined that the plaintiff could perform sedentary work.  *Id.*

This Court will not follow *Wiley* (and the Commissioner's rationale) for three reasons.  First, the Court does not agree that the mere discussion of the VA medical records underlying the VA disability determinations is the same as implicit consideration of the VA disability determinations where there is no indication that the ALJ's decision ever considered the VA determination.  Without any reference to the VA disability determinations in the ALJ's decision, the Court finds that it is impossible to conclude that the ALJ implicitly considered the VA disability decision and ratings

50

(or gave them great weight). This omission more likely suggests that the ALJ overlooked the disability decisions when drafting his decision. This is especially true in this case where the administrative record consists of nearly 1,700 pages of documents.

Second, the absence of any discussion of the VA disability determinations is akin to a broad rejection of these VA findings. Under Eleventh Circuit law, the ALJ errs when he broadly rejects evidence because the Court cannot perform any sort of meaningful review. *See Dyer*, 395 F.3d at 1211. As such, the Court does not find it appropriate to accept the Commissioner's argument that the mere consideration of VA treatment records is akin to a consideration of and giving great weight to the VA disability findings.

Third, the Court concludes that to excuse the ALJ's complete failure to consider the VA disability determinations would essentially constitute the Court supplying a rationale for the Commissioner's decision. It is the ALJ's job to explain why he treated the VA disability determinations in the manner that he did. The Court must only decide whether such a conclusion is supported by substantial evidence. Thus, the Court would abandon its role in Social Security cases by both determining that the VA implicitly considered the VA disability determinations and that such implicit consideration was

51

supported by substantial evidence.  The Court refuses to act in this manner no matter how well reasoned the ALJ's decision may otherwise be.

Accordingly, the Court **REVERSES** the final decision of the Commissioner and **REMANDS** Plaintiff's case to the Commissioner for consideration of the VA disability determinations.  Given this conclusion, the Court only briefly addresses Plaintiff's two other claims of error.

B.      *Social Security Ruling 83-20*

Plaintiff argues that the ALJ erred by failing to consult a medical advisor to determine the onset date of Plaintiff's disability as outlined in Social Security Ruling 83-20.  [Doc. 15 at 18-21].  Plaintiff notes that the VA made a total disability determination beginning on July 2002 and appears to argue that Plaintiff's condition had not appreciably changed from 2001.  As a result, Plaintiff asserts that the ALJ should have consulted a doctor to determine the onset date for Plaintiff's disability. [*Id.* at 21].

The Commissioner argues that SSR 83-20 is not relevant to this case because there was no finding of disability, rendering it unnecessary to find an onset date. [Doc. 16 at 9-10].  Plaintiff argues that the Commissioner's reading of SSR 83-20

52

should be rejected and that the ALJ should have consulted a medical advisor for assistance in determining an onset date. [Doc. 24 at 9-16].

Although this case must be remanded for the ALJ to consider the VA disability finds, the Court outlines the relevant law for the parties concerning whether the ALJ must call a medical advisor to determine the onset date because the issue may arise on remand. Social Security Ruling 83-20 provides that "the established onset date must be fixed based on the facts and can never be inconsistent with the medical record evidence." SSR 83-20. A medical advisor is sometimes required to assist the ALJ in finding the onset date for the disability. *See id.* Specifically, the Rule states that

> [d]etermining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.

*Id.* When the date of onset must be inferred, the ALJ "should call on the services of a medical advisor." *Id.*

The Eleventh Circuit has never addressed in a published decision when a medical advisor is necessary under SSR 83-20, but other circuit courts have examined the issue. *See McManus v. Barnhart*, No. 5:04-CV-67, 2004 WL 3316303, *6 n.45 (M.D. Fla. Dec.14, 2004). The *McManus* decision from the Middle District of Florida has

identified two competing interpretations of SSR 83-20 by the other circuit courts.  The "restrictive interpretation" by the Sixth and Seventh Circuits views SSR-83-20 as having "no application to cases in which the ALJ does not find the claimant to be disabled" on the grounds that "in the absence of a finding of disability there is no reason to determine the date of onset."  *Id.* at \*6 & n.46 (citing *Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004), and *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997)).  The "less restrictive interpretation" by other circuits indicates that SSR 83-20 applies "in cases where [(1)] the claimant's impairment is slowly progressive," (2) "the ALJ is required to make a retroactive inference of disability prior to the date last insured," and (3) "the medical evidence during that time period is ambiguous or inadequate." *Id.* at \*6 & n.47.[17]

Since it is unclear what will transpire on remand, the Court does not resolve which interpretation of SSR 83-20 should prevail or whether a medical advisor will be necessary in Plaintiff's case.  The Court notes, however, that if the Commissioner

---

[17]     The undersigned notes that an unpublished decision from the Eleventh Circuit appears to follow this less restrictive interpretation. *See March v. Massanari*, No. 00-16577, 265 F.3d 1065 (Table), slip op. at 5 (11th Cir. July 10, 2001) (rejecting the Commissioner's argument that SSR 83-20 did not require a medical advisor because plaintiff failed to prove disability prior to the date last insured because there was "strong evidence that [plaintiff] became disabled at some time," rendering a determination of the onset date "critical" and a medical advisor opinion necessary).

AO 72A
(Rev.8/8
2)

determines that Plaintiff is not disabled, then SSR 83-20 will not apply under the restrictive interpretation.  However, the SSR 83-20 medical advisor requirement may apply under the less restrictive interpretation if there is strong evidence that Plaintiff is disabled and the evidence of onset is ambiguous or inadequate.[18]  The Court leaves these issues for the parties to resolve if necessary on remand.

C.      *Residual Functional Capacity*

Plaintiff argues that the ALJ's RFC disregards limitations and restrictions supported by the treating medical professionals, but Plaintiff has not explicitly identified the omitted restrictions.  Instead, she refers to the statement of facts portion of her brief.  [Doc. 15 at 23].  Plaintiff then asserts that the ALJ did not have good cause in rejecting the limitations identified by the treating medical professionals, so they should have been incorporated into the RFC.  [*Id.* at 23-24].

The Commissioner argues that the ALJ did not err in formulating the RFC. [Doc. 16 at 10-23].  First, the Commissioner asserts that the ALJ was not required to incorporate the doctor's limitations into the RFC if other evidence does not so require. [*Id.* at 11].  Second, the Commissioner contends that the ALJ had good cause for

---

[18]      As the lengthy summary of Plaintiff's medical records demonstrates, the medical records for Plaintiff are neither inadequate nor ambiguous after July 23, 1998, but there is little if any evidence concerning Plaintiff's conditions prior to this date.

AO 72A
(Rev.8/8
2)

disregarding the opinions of Drs. Saldivia and Hsu.  As for Dr. Saldivia, the Commissioner asserts that the opinions from 2004 and 2006 do not relate back to the insured period that ended on December 31, 2002, and that these opinions are contrary to the evidence for the relevant period, which showed little evidence of paranoia, made little reference to an inability to concentrate, suggested that Plaintiff functioned well in her daily living, and indicated that Plaintiff could tolerate people and deal with stress. [*Id.* at 12-18].  The Commissioner finally notes that the ALJ incorporated limitations outlined in Dr. Saldivia's October 2004 letter into the RFC.  [*Id.* at 21].  As for Dr. Hsu, the Commissioner argues that Dr. Hsu's July 2008 opinion does not and cannot relate back to the relevant period because Dr. Hsu only began treating Plaintiff in April 2007. [*Id.* at 21].  Also, the Commissioner argues that the ALJ properly discounted the limitations because they were inconsistent with Dr. Hsu's finding that Plaintiff had a GAF score of 65 and the consistent GAF scores between 50 and 60 assigned to Plaintiff.  [*Id.* at 23-24].  Plaintiff argues that the ALJ improperly substituted his own opinion for that of the treating doctor's in formulating the RFC.  [Doc. 24 at 17-18].

The Court does not resolve whether the ALJ's RFC determination was proper in this case because the case must be remanded for the ALJ to consider the VA disability determinations.  However, the Court addresses Plaintiff's misguided argument that it

was improper for the ALJ to reject the 2007 opinion by Dr. Hsu and the 2006 opinion by Dr. Saldivia.  The ALJ's main (but not only) basis for rejecting Dr. Saldivia's 2006 opinion and  Dr. Hsu's July 2008 opinion was that they did not relate back to the relevant period.  [*See* R12].  This is an acceptable ground for rejecting these opinions because courts have concluded that the ALJ may give little weight to an opinion, even from a treating source, when it does not relate back to the relevant period.  *Homrighouse v. Astrue*, No. 5:08-cv-374, 2009 WL 3053705, *9 (M.D. Fla. Sept. 18, 2009) (finding evidence supported giving opinion little weight where, *inter alia*, it did not state that it was intended to relate back); *Lofgren v. Astrue*, No. 1:06-cv-143, 2008 WL 1323396, *1 (N.D. Fla. Apr. 4, 2008) ("While a retrospective opinion can prove the existence of a disability, the retrospective opinion must refer *clearly* to the relevant disability period, and not simply express and opinion to the claimant's current status.") (emphasis in original).[19]  As such, the Court finds that Plaintiff's argument

---

[19]     Where a retrospective opinion does relate back to the relevant time period, it is evidence that should be considered by the ALJ.  *See Boyd v. Heckler*, 704 F.2d 1207, 1211 (11th Cir. 1983) (joining Second and Seventh Circuits "that a treating physician's opinion is still entitled to significant weight notwithstanding that he did not treat the claimant until after the relevant determination date"); *see also Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 547 (3d Cir. 2003) *Wilkins v. Sec'y, Dep't of Health and Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (*en banc*) ("This court has recognized that a treating physician may properly offer a retrospective opinion on the past extent of an impairment.").  The opinions by Dr. Hsu and Dr. Saldivia do not

57

about the ALJ's treatment of these medical opinions is unpersuasive.  Although the evidence supports the ALJ's decision not to give weight to the 2006 and 2008 opinions, the ALJ must still reconsider the RFC after reviewing and evaluating the VA disability determinations.

## VII.   CONCLUSION

For the reasons discussed above, the Court **REVERSES** the final decision of the Commissioner and **REMANDS** Plaintiff's case to the Commissioner.  The Clerk is **DIRECTED** to enter judgment in Plaintiff's favor.

**IT IS SO ORDERED AND DIRECTED**, this the 17th day of May, 2010.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

---

explicitly indicate that they relate back to the relevant period.  Instead, both opinions suggest that they were relevant to the period when they were completed because both opinions make reference to Plaintiff's GAF from the past year in which the evaluations were completed.  [*See* R1661 (Hsu), 1677 (Saldivia)].  As such, they are not retrospective opinions and not entitled to weight.

58